## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **K.K-M., individually and as Kinship Legal Guardian of the minor children R.M. and A.W.,** | **Case No. 17–cv–11579–ESK–MJS** |
| **Plaintiff,** | |
| v. | **OPINION** |
| **NEW JERSEY DEPARTMENT OF EDUCATION, *et al.*,** | |
| **Defendants.** | |

**KIEL, U.S.D.J.**

**THIS MATTER** involves, in part, plaintiff's claims against the Gloucester City Board of Education d/b/a Gloucester City Public Schools (GCPS) for its alleged failure to provide A.W. and R.M. (collectively, Children) with a Free Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (IDEA). Pending before the Court is plaintiff's motion for partial summary judgment against the GCPS "on the issues[s] of GCPS'[s] failure to timely evaluate [the Children]" (ECF No. 214–1 p.1) and the Administrative Law Judge's (ALJ) "serious legal error [in] finding that GCPS met its burden of proof that it provided a [FAPE] to the … [C]hildren" (*id.* p.5.) GCPS filed opposition to the Motion (ECF Nos. 217, 218), to which plaintiff filed a reply in further support of the Motion (ECF No. 219). For the following reasons , the Motion will be DENIED.

## FACTS AND PROCEDURAL HISTORY

I derive the relevant facts from the plaintiff's statement of undisputed material facts (SUMF) (ECF No. 214–2), GCPS's response to plaintiff's statement of material facts (RSUMF) (ECF No. 217–2), GCPS's

counterstatement of undisputed material facts (Def.'s CSUMF) (ECF No. 217–3), and plaintiff's response to GCPS's counterstatement of undisputed facts (Pl.'s Reply CSUMF) (ECF No. 219–1).

## I.   PLAINTIFF'S CLAIMS

This original complaint in this matter was filed on November 14, 2017. (ECF No. 1.)   The operative complaint is now the 115-page third amended complaint (Compl.).   (ECF No. 133.)   In the third amended complaint, plaintiff describes her claims as "an appeal as of right from final decisions entered in two administrative special education due process matters … [on] March 16, 2020 by ALJ David Fritch … [and on] March 9, 2020 by ALJ Judith Lieberman."   (Compl. ¶1.)   Plaintiff also claims this matter "arises from systematic flaws in NJDOE's system for resolving special education cases in the State of New Jersey, the OAL's illegal implementation of such system, and GCPS'[s] violations of IDEA by taking advantage of the broken system."   (*Id.*)

A.W.'s birthdate is January 3, 2001 and R.M.'s is May 2, 2002.   (*Id.* ¶¶8, 9.)   Both Children have disabilities.   A.W.'s primary diagnosis is "Other Health Impairment—Diabetes" and R.M.'s is "Other Health Impairment—other medical condition."   (*Id.*)   Additionally, both Children "had learning disabilities" and were eligible for "special education and related services under IDEA" and New Jersey state law.   (*Id.*)

The Children were first identified and deemed eligible for special education by a school district in Arkansas prior to 2011.   (*Id.* ¶107.)   Each Child had an individualized education program (IEP).   The Children and their mother moved to Deptford Township sometime before the 2012–2013 school year.   (*Id.*¶108.)   The Deptford Township Board of Education adopted and amended the IEPs for the Children that had been established in Arkansas. (*Id.* ¶109.)   The Children and their mother then became homeless by early

June 2013 and subsequently moved to a motel in Gloucester City in the Fall of 2013.   (*Id.* ¶¶ 110, 111.)

It is an understatement to say that the Children had difficult and traumatic childhoods. They were abused and suffer from "serious psychological problems." (*Id.* ¶¶ 112–118.)   By August 2015, the Children had been twice removed from their mother and placed with plaintiff as a "foster home" in Deptford, New Jersey. (*Id.* ¶¶ 119–122.)   On May 16, 2017, the Superior Court of New Jersey granted kinship legal guardianship of the Children to plaintiff. (*Id.* ¶ 123.)   As a result of the kinship legal guardianship with the Children living in Deptford and pursuant to certain court orders, GCPS no longer had "legal responsibility for ensuring a FAPE" for the Children from May 16, 2017 through the 2018–2019 school year. (*Id.* ¶ 125.)

The Children, however, remained enrolled at GCPS through the 2018–2019 school year. (*Id.* ¶ 127.)   While the Children were enrolled at GCPS, GCPS's superintendent, Dennis Vespe, contacted the superintendent at the Deptford school and demanded that the Deptford school take responsibility for providing FAPE to the Children. (*Id.* ¶ 126.)   Apparently a dispute ensued between the two districts, resulting in two due process cases being filed before the Office of Administrative Law (OAL). (*Id.* ¶¶ 131–140.)   Plaintiff claims the ALJs erred in their resolution of the due process cases. (*Id.* pp. 38–60.)

As for the claims against GCPS, plaintiff asserts that GCPS failed to perform necessary evaluations on the Children and did not assess whether the existing IEPs were appropriate when they were transferred from the Deptford school to GCPS. (*Id.* ¶ 240.)   Plaintiff also claims a myriad of violations by GCPS (*id.* ¶¶ 242–267) including that it failed to evaluate the Children after May 2014 (*id* ¶ 267(c).

## II.   RELEVANT UNDISPUTED FACTS

The Children were enrolled at the Deptford Public Schools during the 2012–2013 school year, and enrolled at GCPS on October 2, 2013.   (SUMF ¶¶ 3, 4; RSUMF ¶3, 4.)   When A.W. enrolled at GCPS, she had an IEP from Deptford public schools.   (SUMF ¶5; RSUMF ¶5.)   Upon A.W.'s enrollment at GCPS, GCPS conducted a speech evaluation and completed further collaborative assessments following a referral to intervention and referral services (IRS).   (CSUMF ¶81; Pl.'s Reply CSUMF ¶81.)   On October 25, 2013, an identification evaluation plan meeting was held for A.W., at which time it was decided a speech evaluation would be conducted to determine A.W.'s eligibility for services.   (CSUMF ¶82;  Pl.'s Reply CSUMF ¶82.)

As of November 14, 2013, GCPS declared the Children eligible for special education or related services under the IDEA category of Speech/Language— Articulation Services.   (SUMF ¶¶9, 10, 11; RSUMF ¶¶9, 10, 11.)   R.M. was offered an IEP and therefore was entitled to receive a FAPE from GCPS no later than November 14, 2023.   (SUMF ¶12; RSUMF ¶12.)   R.M. was referred to GCPS's intervention and referral services on November 15, 2013 "due to below grade level reading, writing, and math skills."   (SUMF ¶58; RSUMF ¶58.) A.W. was found eligible based on articulation concerns and a speech IEP was designed that created a program for A.W. to receive speech services three times per month for thirty minutes.   (SUMF ¶¶6, 7, 11; RSUMF ¶¶6, 7, 11; CSUMF ¶83; Pl.'s Reply CSUMF ¶83.)[1]

---

[1] Although plaintiff asserts "R.M. had an IEP from Deptford Public Schools for the 2012–2013 school year because her eligibility form indicates that there was an IEP conference date held on May 8, 2012 and that she left the district before the 'annual review meeting' for her 2013–2014 IEP[,]" (SUMF ¶8), the record does not bear this out.   The document relied upon by plaintiff is marked "draft" and does not specifically state that an IEP was in effect for R.M. during the 2012–2013 school year at Deptford. (ECF No. 214–4 p.55.)

A.W.'s English language arts score of 157 and mathematics score of 188 on the 2014 New Jersey Assessment of Skills and Knowledge Test (NJ ASK) placed her in the lowest category of "[p]artially [p]roficient" in both areas. (SUMF ¶¶ 59, 60; RSUMF ¶ 59, 60.)

Similarly, R.M.'s English language arts score of 160 and mathematics score of 191 placed on the 2014 NJ ASK placed her in the lowest category of "[p]artially [p]roficient" in both areas.   (SUMF ¶ 61, 62; RSUMF ¶ 61, 62.)

In February of 2014, A.W. was referred to the Child Study Team (CST) by her teacher and the principal.  (CSUMF ¶ 84; Pl.'s Reply CSUMF ¶ 84.) Based on the referral to CST, an evaluation meeting was held for A.W. on March 4, 2014.  (CSUMF ¶ 85; Pl.'s Reply CSUMF ¶ 85.)   During this meeting, GCPS reiterated that A.W.'s grades were "poor" for the 2013–2014 school year at GCPS.  (SUMF ¶¶ 56, 57; RSUMF ¶¶ 56, 57.)  A.W.'s mother also reported changes in A.W.'s behavior and revealed that A.W. had ADHD and was not taking her medication.  (CSUMF ¶ 86;  Pl.'s Reply CSUMF ¶ 86.)  It was ultimately decided that "Educational, Psychological, Social Evaluations and Speech and Language Assessment" would be completed to determine whether A.W. was eligible for special education and related services based on an educational disability.  (CSUMF ¶ 85; Pl.'s Reply CSUMF ¶ 85.)   ~~Plaintiff~~ Signed consent was given for the evaluations and assessment on March 14, 2014.   (*Id.*)

### A.   2014 Evaluations by GCPS

### 1.   A.W.

In April and May of 2014, GCPS conducted a social history assessment, as well as psychological, learning, and speech and language evaluations of A.W. (SUMF ¶ 14; RSUMF ¶ 14; CSUMF ¶ 88; Pl.'s Reply CSUMF ¶ 88.) Specifically, A.W. was evaluated as follows:

-   WISC-IV administered on April 28, 2014;

5

- WIAT-III administered on April 10, 2014;

- Social Assessment performed on April 9, 2014; and

- Speech and Language Evaluations performed on April 25, 2014 and May 12, 2014.

(SUMF ¶ 15; RSUMF ¶ 15.)

GCPS's cognitive evaluation of A.W. (WISC-IV) indicated that she "is functioning in the borderline range of ability overall … her skills ranged from average to extremely low." (SUMF ¶ 16; RSUMF ¶ 16.) The evaluation concluded in part that A.W.'s "word knowledge, fluid reasoning, ability to mentally manipulate orally presented information, processing speed, and visual memory/discrimination fell in the low average range … her nonverbal conceptual reasoning and auditory short-term memory scores both fell in the extremely low range." (SUMF ¶ 17; RSUMF ¶ 17.)  Of the 14 subtests of the educational evaluation (WIAT-III), seven of A.W.'s scores were in the below average range and three were in the low range.  (SUMF ¶ 18; RSUMF ¶ 18.) The WIAT-III concluded that A.W.'s total achievement score "was in the below average range, with a standard score of 72, and within the 3rd percentile." (SUMF ¶ 19; RSUMF ¶ 19.)

GCPS's speech and language evaluation of A.W. "indicated a Spoken Language Composite score in the poor range" and revealed "articulation errors that impact connected speech for an unfamiliar listener"—articulation errors which "negatively impact classroom performance." (SUMF ¶¶ 20, 21, 22; RSUMF ¶¶ 20, 21, 22.) The evaluation determined "progress has been minimal due to absences and a recently discovered health condition."  (CSUMF ¶ 89; Pl.'s Reply CSUMF ¶ 89.)  It was further noted that:

> In the small group session, [A.W.] is pleasant, takes turns and will ask questions of the boys in the group.  She tends to monopolize conversations and will [ask] a question and not wait for an answer.  When reminded of this, she tries very hard to comply … Organizing language, grammar,

> and speaking were areas of need.   Listening and semantic skills were relative strengths.   The CELF-4 indicated a Core Language Score within the borderline range. Receptive Language and Language Memory index scores were within the average range.   Formulating sentences (with picture cues) and [u]nderstanding spoken paragraphs were subtests within the average range.

(*Id*.)

The speech and language evaluation concluded that "organizing language, grammar and speaking were areas of need."   (SUMF ¶23; RSUMF ¶23.) Based on these results, A.W. was found to be eligible for special education and related services under the category of "Other Health Impaired" for diabetes and ADHD.   (CSUMF ¶88;  Pl.'s Reply CSUMF ¶88.)

## 2.   **R.M.**

A "Collaborative Assessment" for R.M., encompassing a social assessment, as well as psychological and learning evaluations, was assembled in April 2014. (Def.'s CSUMF ¶34; Pl.'s Reply CSUMF ¶34.)   Additionally, a speech and language assessment was completed in April 2014, expanding on the November 2013 speech and language testing.   (*Id*.)   Specifically, R.M. was evaluated as follows:

- Psychiatric Evaluation on April 2, 2014;

- Clinical Evaluation of Language Fundamentals-4 on April 17, 2014;

- Test of Language Development – Intermediate (TOLD-1:4) on April 25, 2014;

- WISC-IV on April 9, 2014;

- WIAT-III on April 14, 2014; and

- Social Assessment on April 9, 2014.

(SUMF ¶24; RSUMF ¶24.)

The cognitive evaluation (WISC-IV) concluded that R.M. was "functioning in the low average range of ability" and that R.M.'s "word knowledge, ability to analyze and synthesize visual stimuli, and processing speed" fell in the low average range.   (SUMF ¶¶ 25, 26; RSUMF ¶¶ 25, 26.)   Of the 14 subtests of the educational evaluation (WIAT-III), eight of R.M.'s scores were in the below average range and two were in the low range.   (SUMF ¶ 27; RSUMF ¶ 27.) The psychiatric evaluation of R.M. concluded that she "is somebody who would meet criteria for special education services … certainly many categories may be met (could be Communications Impaired but also even Emotionally Disturbed or Other Health Impaired for anxiety and other comorbidities)."   (SUMF ¶ 28; RSUMF ¶ 28.)   The Goldman-Friscoe Test of Articulation found that R.M. "exhibited articulation errors … [which] negatively impact the clarity of her message."   (SUMF ¶ 29; RSUMF ¶ 29.)

### B.   June 2014 Eligibility Conference

#### 1.   A.W.

On June 2, 2014, GCPS held an eligibility conference for A.W., during which the April evaluation results were utilized to determine her IEP eligibility.   (CSUMF ¶¶ 88, 90; Pl.'s Reply CSUMF ¶¶ 88, 90.)   Additionally. A.W.'s mother reported to GCPS that she had "no behavioral concerns" regarding A.W.   (CSUMF ¶ 87; Pl.'s Reply CSUMF ¶ 87.)   Based on the evaluation results, A.W. was found to be eligible for special education and related services under the category of "Other Health Impaired" for diabetes and ADHD.   (CSUMF ¶ 88; Pl.'s Reply CSUMF ¶ 88.)   An IEP was developed in support of the eligibility findings, in which A.W. was placed in an in-class support program with a special education teacher and approximately sixty accommodations, as well as speech and language therapy.   (CSUMF ¶ 90; Pl.'s Reply CSUMF ¶ 90.)

## 2.   R.M.

With respect to R.M., GCPS commented in its June 2, 2014 eligibility conference report that R.M.'s "connected speech is very difficult to understand" and that she "becomes frustrated when her peers and teachers ask her to repeat."   (SUMF ¶ 30; RSUMF ¶ 30.)   GCPS further indicated that R.M. has mixed anxiety disorder which adversely affects her educational performance.  (SUMF ¶ 31; RSUMF ¶ 31.)   However, GCPS did not declare that R.M. was eligible under the categories of communications impaired or emotionally disturbed.   (SUMF ¶ 32; RSUMF ¶ 32.)   Instead, GCPS determined that R.M. was eligible for special education and related services under the category of "Other Health Impaired" related to anxiety and related comorbidities.  (CSUMF ¶ 35; Pl.'s Reply CSUMF ¶ 35.)   An IEP was developed for R.M. that same day based on the eligibility determination, which provided R.M. was to receive modifications in her current program and speech and language twice a week.   (CSUMF ¶¶ 36, 37; Pl.'s Reply CSUMF ¶¶ 36, 37.)

### C.   June 2014 IEP Review

In an effort to plan for the following school year, GCPS held an annual IEP review for the Children on June 18, 2014.   (CSUMF ¶ 91; Pl.'s Reply CSUMF ¶ 91.)   A.W.'s Annual IEP Review placed her in an in-class support program and continued to require speech and language therapy beginning June 26, 2014 through June 26, 2015.   (*Id.*)

The program established for R.M. also provided for an in-class support program with speech and language services[2] beginning June 26, 2014 through June 26, 2015.   (CSUMF ¶ 38; Pl.'s Reply CSUMF ¶ 38.)

---

[2] When R.M. entered the district, she was receiving speech and language services twice a week for 20 minutes in a group.   (CSUMF ¶ 39;  Pl.'s Reply CSUMF ¶ 39.) However, after the full Child Study Team evaluation, additional speech and language goals and objectives were added to R.M.'s IEP and she began receiving speech and language services three times a week for ten minutes.   (*Id.*)   In an effort to further

D.      **2014–2015 PARCC Results**

With respect to the 2014 to 2015 New Jersey Partnership for Assessment of Readiness for College and Careers assessment (PARCC)[3] results, A.W.'s English language arts/literacy and mathematics scores were below the school, district, state, and the PARCC averages.   (SUMF ¶¶ 63, 64; RSUMF ¶¶ 63, 64.)

R.M.'s English Language Arts/literacy score was 717, which was below the school, district, state, and PARCC averages, and did not meet expectations. (SUMF ¶¶ 65, 66; RSUMF ¶¶ 65, 66.)   R.M.'s mathematics score was similarly below the school, district, state, and PARCC averages.   (SUMF ¶ 67; RSUMF ¶ 67.)

E.      **2015 IEP Reviews**

1.      **A.W.**

On May 29, 2015, A.W.'s annual IEP review planned for A.W. to continue her in-class support program in eighth grade, but removed speech therapy as a related service.   A.W. no longer wanted to continue pull-out speech and language services and the CST believed they could work towards her goals within the classroom, therefore A.W.'s wish was honored.   (CSUMF ¶¶ 93, 104; Pl.'s Reply CSUMF ¶¶ 93, 104.)   As referred to in ALJ Fritch's opinion:

> A.W. requested to be dismissed from the services [at] the end of seventh grade and was "noncompliant about

---

increase her progress, R.M. began receiving speech and language services on an individual basis for twenty-five minutes, six times a month.   (*Id*.)   Seeing progress on her language goals and seeking to increase progress toward articulation goals, R.M. later began receiving speech and language services for 25 minutes, three times a month.   (*Id*.)

[3] PARCC is a computer-based standardized test administered towards the end of each school year to "measure student progress toward goals in language arts and mathematics."   https://www.njsba.org/wp-content/uploads/2016/03/parcc-faq.pdf, p.1. On February 3, 2015, the CST held an annual IEP review for R.M. and added additional modifications for PARCC Testing.   (CSUMF ¶ 40; Pl.'s Reply CSUMF ¶ 40.)

attending sessions and refused home practice" as well as needed to deal with a variety of health and personal issues' during this time.   A.W.'s therapist also reported at that time that A.W.'s deficits would be managed in the classroom which is the least restrictive setting, and A.W. reported that she was "satisfied with her speech and no longer wanted to attend therapy."   Based on these factors, A.W.'s request to discontinue therapy was granted. While A.W.'s parents were not present at this meeting, it is the practice of the [d]istrict to always invite the child's parents to the meetings.   A.W.'s speech therapy was not reincorporated until May 2016 for ninth grade at her caretaker, [plaintiff's] request.   There was no parent signature on the evaluation plan meeting document.   The DCPP worker, Tiffany, signed the document.   (internal citations to administrative record omitted.)

(CSUMF ¶ 93; Pl.'s Reply CSUMF ¶ 93.)

### 2.   **R.M.**

On June 3, 2015, an annual IEP review was held for R.M., at which time the Child Study Team decided that R.M. should move into a self-contained program for seventh grade and continue to receive speech and language services.   (CSUMF ¶ 41;  Pl.'s Reply CSUMF ¶ 41.)

### F.   **2015–2016 PARCC Results**

### 1.   **A.W.'s Performance**

A.W.'s mathematics score on the 2015–2016 New Jersey PARCC was 739, which approached, but did not meet, expectations.   (SUMF ¶ 68; RSUMF ¶ 68.) A.W.'s mathematics score on the 2015–2016 New Jersey PARCC indicated that she may need additional support to meet expectations in the next course. (SUMF ¶ 69; RSUMF ¶ 69.)   A.W.'s English language arts/literacy score on the 2015 to 2016 New Jersey PARCC was 737, which also approached, but did not meet expectations, thereby indicating she may need additional support to meet expectations in the next course.   (SUMF ¶¶ 70, 71; RSUMF ¶¶ 70, 71.)

### 2.    R.M.'s Performance

R.M.'s mathematics score of 724 and English language arts/literacy score of 696 on the 2015–2016 New Jersey PARCC were below the school, district, the state, and cross-state averages, and partially met but did not fully meet expectations.   (SUMF ¶¶ 72, 76; RSUMF ¶¶ 72, 76.)

### G.    R.M.'s 2016 Speech Therapy Report

On April 25, 2016, a speech therapy report regarding R.M. was prepared, which indicated she is attentive during therapy, however:

> [R.M.] does not complete any home practice to reinforce therapy.  She refuses (politely) additional home practice activities.  Additional therapy time may be helpful in [R.M.] is ready to put forth the work required of her. When she was in sixth grade and felt the demands were too much, she would shut down and become silent.  She seems to be happier this year, but has not assumed responsibility for her speech sound production such as daily practice or self-monitoring.

(Def.'s CSUMF ¶ 42; Pl.'s Reply CSUMF ¶ 42.)

### H.    2016 IEP Reviews

### 1.    A.W.

At A.W.'s annual IEP review on May 23, 2016, Department of Child Protection and Permanency (DCPP) in-home counselor Trisha Roland, along with plaintiff, "requested that [A.W.] receive speech therapy again.  Goals have been added to the IEP based on the previous performance and testing, but she will only improve if she is ready to take ownership of her articulation." (CSUMF ¶ 96;  Pl.'s Reply CSUMF ¶ 96.)  It was determined that A.W. would continue in ninth grade with speech and language therapy reincorporated into her program and an in-class support program would be made available to her. (CSUMF ¶ 94;  Pl.'s Reply CSUMF ¶ 94.)

2.   **R.M.**

Also on May 23, 2016, an annual IEP review was held for R.M.   (Def.'s CSUMF ¶43; Pl.'s Reply CSUMF ¶43.)    At this meeting, plaintiff and Trisha Roland expressed concern about R.M. remaining in the self-contained classroom, despite her good grades.   (Def.'s CSUMF ¶44; Pl.'s Reply CSUMF ¶44.)   The team did consider an in-class resource program, but based on R.M.'s emotional state and anxiety, felt she required the continuing support offered by the self-contained environment.   (Def.'s CSUMF ¶43; Pl.'s Reply CSUMF ¶43.) As such, the team ultimately decided to continue the self-contained program for eighth grade.   (Def.'s CSUMF ¶44; Pl.'s Reply CSUMF ¶44.)

I.   **Teachers' Comments About A.W.**

On June 13, 2016, General Language Arts teacher Cari Poppa wrote:

> [A.W.] comes to school every day with a smile on her face and ready to learn.  She is prepared for class and well organized and an active participant.  She asks for help when she is struggling and [sic] taking advantage of her IEP. A wonderful student who sets goals and accomplishes them.   Socially is making friends.  She has matured in eighth grade and [she] taking steps to be proactive in her health and wellbeing and making healthy food choices on several occasions.  She asks to go to the [n]urse immediately during class when she's not feeling well.

(Def.'s CSUMF ¶102; Pl.'s Reply CSUMF ¶102.)

On June 15, 2016, Special Education teacher Jennifer Grelle wrote of A.W.:

> She has become more confident—a more confident young lady and has seen improvement in hygiene, taking pride in how she presents herself.   More social, seems to have more friends. Is being more conscientious about managing her diabetes and sets times throughout the when she checks in with the [n]urse if she feels off.   She's been on top of her grades more so this year.   Her

13

classwork is always complete and she completes her homework.

(Def.'s CSUMF ¶ 103; Pl.'s Reply CSUMF ¶ 103.)

### J.    2016–2017 School Year

#### 1.    A.W.

At plaintiff's request, GCSP again provided A.W. with three weekly 25-minute speech and language sessions in a group setting for the 2016–2017 school year.    (Def.'s CSUMF ¶ 104; Pl.'s Reply CSUMF ¶ 104.)    A.W.'s first marking period report card for the 2016–2017 school year denoted passing grades in all of her classes.    (Def.'s CSUMF ¶ 100; Pl.'s Reply CSUMF ¶ 100.) Additionally, A.W.'s teachers reported a "great attitude and effort" and that A.W. was "volunteering and participating" in class.    (*Id.*)

#### 2.    R.M.

The district held a pupil status review/evaluation plan meeting for R.M. on February 1, 2017, at which time the team reviewed prior evaluations, teacher input, standardized testing, and other relevant information, and determined no additional information was needed to assess continued eligibility.    (Def.'s CSUMF ¶¶ 45, 63; Pl.'s Reply CSUMF ¶¶ 45, 63.)    The meeting's participants included a general education teacher, special education teacher, school psychologist, R.M.'s mother, and DCPP representative Tiffany Jubb.    (Def.'s CSUMF ¶¶ 7, 8, 9, 10, 45, 63; Pl.'s Reply CSUMF ¶¶ 7, 8, 9, 10, 45, 63.)    A memorandum documenting the discussions at the meeting (Def.'s CSUMF ¶¶ 1, 3) [4] provides: (a) the results of R.M.'s April 2014 formal

---

[4] Plaintiff objects to the manner in which GCPS cites to certain documents in support of its Counterstatement of Undisputed Material Facts.    Specifically, plaintiff argues that "[t]hroughout GCPS'[s] Counterstatement of Material Facts it references 'T1R,' but does not attach any corresponding documents or explain to what such refers. Further, GCPS did not submit a certification to verify these references, so they should be disregarded by the Court."    (ECF No. 219–1 n.1) (citation omitted).    Although defendant does utilize "T1R" as a citation label without explanation regarding to what

evaluations; (b) brief history of how R.M. became eligible for special education services and previous placements; (c) a statement about R.M. by her science teacher; (d) a statement about R.M. by her math teacher; (e) statement about R.M. by her English teacher; (f) statement about R.M. by her health teacher; and, (g) statement about R.M. by her mother, B.M.   (Def.'s CSUMF ¶¶ 16, 45; Pl.'s Reply CSUMF ¶ 45.)   With specific regard to B..M,  she expressed that she was pleased R.M.'s self-confidence was growing; however, she was concerned about R.M.'s transition to ninth grade.   (Def.'s CSUMF ¶ 47; Pl.'s Reply CSUMF ¶ 47.)   Nevertheless, upon receipt of notice that "PARENTS HAVE THE RIGHT TO REQUEST A **REEVALUATION** EVEN IF THE IEP TEAM DOES NOT DEEM IT NECESSARY[,]" B.M. did not opt to request a reevaluation.   (Def.'s CSUMF ¶ 11) (emphasis in original).   Underneath the notice, was text that read: "PARENT REQUEST: I request the following assessments be conducted:[,]" along with a signature line for two parents. (ECF No. 217–1 p. 5.) That portion of the form was left blank.   (*Id*.) However, B.M.—along with the in-home counselor from DCPP — did sign below that area to indicate they agreed they had input regarding the determination of the nature and scope of the student's evaluation.   (Def.'s CSUMF ¶ 44; Pl.'s Reply CSUMF ¶ 44.) [5]

R.M.'s February 2017 report card showed she achieved the grade of "A" in every class except Health, for which she received a "C."   (Def.'s CSUMF ¶ 48;

---

it might refer, a reading of GCPS's Brief in Opposition to the Motion identifies these documents as exhibits to their brief.   <u>See</u> ECF No. 217 p. 7 ("<u>See</u> T1R-116 (attached herein as Exhibit C) and T1R-37 (attached herein as Exhibit A))"; ECF No. 217 p. 8 ("<u>See</u> T1R-115 (attached herein as Exhibit B).").   To the extent the contested documents are otherwise labeled as specific exhibits and are attached to GCPS's brief, I will not preclude them.

[5] None of R.M.'s IEPs (as opposed to evaluations) reviewed for the first due process hearing contained any requests reflected in the "Interests and preferences of the student and parental input used to develop the IEP" section.   (Def.'s CSUMF ¶ 69; Pl.'s Reply CSUMF ¶ 69.)

Pl.'s Reply CSUMF ¶48.)   R.M.'s teachers noted that she "exhibits a good attitude and effort.  She displays respect and good manners, consistently performs well, willingly volunteers and participates."   (*Id.*)

### K.   2017 IEPs

At no time between February 1, 2017 and May 16, 2017 did R.M. and A.W.'s parents or plaintiff request formal evaluations in writing.  (Def.'s CSUMF ¶23.)   Between April 28, 2014 and May 16, 2017, GCPS did not conduct formal evaluations or reevaluations of the Children but instead, utilized classroom-based assessments and observations, procedures, tests, records, or reports in determining whether to propose or deny an action. (SUMF ¶33; RSUMF ¶33.)

### 1.   A.W.

On March 29, 2017, the district held a reevaluation for eligibility meeting and annual IEP review for A.W., and discussions regarding each were memorialized in memoranda.   (Def.'s CSUMF ¶¶2, 4, 5; 97; Pl.'s Reply CSUMF ¶ 97.)   On the March 29, 2017 eligibility conference document, there is a notation that plaintiff "participated by phone" because she was home on medical leave.   (Def.'s CSUMF ¶6.)

With respect to the Identification Meeting/Evaluation Plan document, a general education teacher, special education teacher, case manager, speech therapist, and DCPP counselor Tiffany Jubb were present and signed the document. (Def.'s CSUMF ¶¶12, 13; Pl.'s Reply CSUMF ¶97.)  This document contains:

    a.   A.W.'s current placement;

    b.   A brief history of how A.W. became eligible for special education services and previous placements;

    c.   The results of A.W.'s April 2014 formal evaluations;

    d.   PARCC scores for seventh and eighth grade;

e.    A statement about A.W. by her math teacher;

f.    A statement about A.W. by her English teacher;

g.    A statement about A.W. by her science teacher;

h.    A statement about A.W. by her social studies teacher;

i.    Information about how diabetes impacts A.W.'s education and accommodations requested by Cooper Heath System; and,

j.    A statement about A.W. by plaintiff.

(Def.'s CSUMF ¶ 15.)

The Identification Meeting/Evaluation Plan document also provided the following notice: "PARENTS HAVE THE RIGHT TO REQUEST A **REEVALUATION** EVEN IF THE IEP TEAM DOES NOT DEEM IT NECESSARY."   (Def.'s CSUMF ¶ 14) (emphasis in original).

The foregoing discussions resulted in the following conclusions: "[i]t was the determination of those present that further assessment was not needed at this time.   The team agreed that there was enough information on [A.W.] for educational purposes.   Her next triennial[6] date will come when [A.W.] is in 12th grade.   Updating her evaluations then may be prudent for transitional post-high school decisions and plans." (Def.'s CSUMF ¶ 99.) [7]   The IEP developed at the IEP review on March 29, 2017 placed A.W. into a supplemental support program with a support skills class and provided for speech and language, as well as nursing and blood sugar monitoring as related services. (Def.'s CSUMF ¶ 97.)    Although A.W.'s second marking period report card for

---

[6] Although plaintiff takes issue with use of the word "triennial," it is of no consequence to the resolution of the Motion.   I understand the term to refer to the three-year reevaluation period specified by § 1414(a)(2)(B)(ii) of the IDEA.

[7] To the extent plaintiff denies any implications that may be made by this statement, the March 29, 2017 document speaks for itself.   (ECF No. 217–1 p. 20.)

the 2016–2017 school year shows she was passing all classes with a C or better, her exam grades were lower, indicating an issue with testing.   (Def.'s CSUMF ¶ 101; Pl.'s Reply CSUMF ¶ 101.)

### 2.   R.M.

On May 15, 2017, an annual IEP review meeting was held to plan for R.M.'s 9th grade year.   (Def.'s CSUMF ¶ 49; Pl.'s Reply CSUMF ¶ 49.)   The team determined that R.M. would be moving out of the self-contained program and into the less restrictive resource supplemental support program.   (*Id.*) This decision was made with the input of plaintiff, who expressed that "she would like to consider a less restrictive placement for R.M."   (Def.'s CSUMF ¶ 50; Pl.'s Reply CSUMF ¶ 50.)

### L.   Kinship Legal Guardianship

Plaintiff obtained kinship legal guardianship over the Children on May 16, 2017.   (Def.'s CSUMF ¶¶ 17, 72, 126.)   Thus, the Children were no longer residents of Gloucester City and, accordingly, GCPS was no longer required to provide the Children a FAPE after May 16, 2017.   (SUMF ¶ 13; Def.'s CSUMF ¶¶ 18, 72, 126.)  However, the IEPs that GCPS provided for both A.W. and R.M offered special education accommodations, speech and language, and related services both before and after May 16, 2017.   (Def.'s CSUMF ¶¶ 71, 125; Pl.'s Reply CSUMF ¶¶ 71, 125.)

### M.   Due Process Complaints before Acting Director and Chief ALJ Lisa James-Beavers

In October 2017, defendant notified plaintiff that A.W. and R.M. were no longer deemed "residents" of the district, therefore she would need to enroll them in the Laurel Springs School District where they resided.   *K.K-M. on behalf of minor children A.W. and R.M. v. Bd. of Educ. of City of Gloucester City*, 463 N.J. Super. 24, 27, 229 A.3d 210, 212 (N.J. Super. Ct. App. Div. March 10,

2020). In response, plaintiff filed multiple due process complaints on behalf of the Children, the first two of which were heard by ALJ Beavers.[8] In these complaints, plaintiff claimed the district had not performed Independent Educational Evaluations (IEEs) of either child for more than three years. (ECF No. 214–4 p.58.) Plaintiff also sought an adjournment pending completion of the anticipated evaluations.[9] (ECF No. 214–4 p.66.) Without addressing the issue of residency, ALJ Beavers entered an order on April 17, 2018 "Granting Request for [Independent Educational] Evaluations and Adjourning the Hearing." (SUMF ¶34; RSUMF ¶34.) ALJ Beavers ruled in pertinent part:

- There was "good cause" for ordering [IEEs] of each A.W. and R.M. pursuant to N.J.A.C. 1:6A-14.4;

- Good cause exists for IEEs because the most current evaluations were completed almost four years ago, when the students were in middle school;

- Good cause also exists because K.K-M. asserts that [GCPS] repeatedly declined to evaluate the students even when presented with medical reports, the recommendations of medical professionals, and the legal guardian's requests;

- Because of the significant time that has passed since A.W. and R.M.'s last evaluations, [GCPS's] denial of K.K-M.'s requests, and because the crux of the dispute is whether A.W. and R.M. are receiving an appropriate

_____

[8] Doing so also had the effect of permitting the Children to remain in the Gloucester City school district until the due process matters were resolved. This issue is discussed more fully below.

[9] By seeking and obtaining an adjournment, plaintiff's simultaneously pending complaints before ALJ Jeffrey N. Rabin regarding residency (*K.K. on behalf of minor child A.W. v. Gloucester City Board of Education*, OAL Dkt. No. EDS 08360-18 OAL Dkt. No. EDS 08361-18 OAL Dkt. No. EDS 09245-18 OAL Dkt. No. EDS 09247-18; Agency Dkt. Nos. 2018-28026, 2018-28027, 2018-28147 and 2018-28146, 2019 N.J. AGEN LEXIS 451 (N.J. OAL June 7, 2019)) could not proceed.

education, good cause exists to support an order for an
IEE;

- The current evaluations do not reflect [A.W. and R.M.'s]
  present medical and possible academic conditions;

- Payment of IEEs for A.W. and R.M. by GCPS is
  appropriate; and

- GCPS must fund three IEEs for A.W. and six IEEs for
  R.M.

(SUMF ¶ 34; RSUMF ¶ 34; Def.'s CSUMF ¶ 20; Pl.'s Reply CSUMF ¶ 20.)

In deciding whether an adjournment would be appropriate, ALJ Beavers
noted in her decision that GCPS was currently involved in litigation with
plaintiff regarding the issue of residency.   (ECF No. 214–4 p.66.)   GCPS
argued an adjournment would further delay plaintiff's appeal regarding the
residency issue because that challenge could not be pursued while a due process
petition (i.e., evaluations issue) remained pending.   Nevertheless, ALJ
Beavers ordered a 120–day adjournment for "good cause."   (ECF No. 214–4
pp.67, 68.)   GCPS did not appeal this decision.   (SUMF ¶ 35; RSUMF ¶ 35.)

1.   **Evaluations Conducted Pursuant
     to ALJ Beavers' April 17, 2018
     Order**

In June and July 2018, the IEEs ordered by ALJ Beavers were conducted
and the following reports were submitted:

- Education IEE of A.W. by Donna Lewis dated July 13,
  2018;

- Speech/language IEE of A.W. by Rizza Miro-Lemonakis
  dated June 28, 2018;

- Education IEE of R.M. by Donna Lewis dated July 14,
  2018;

- Speech/language IEE of R.M. by Rizza Miro-Lemonakis
  dated June 28, 2018;

- Occupational therapy IEE of R.M. by Marni Ehrlich dated June 12, 2018; and

- Functional behavior assessment IEE of R.M. by Christen Russell dated June 18, 2018.

(SUMF ¶ 36; RSUMF ¶ 36.)

As indicated above, all of the IEEs ordered by ALJ Beavers occurred after May 16, 2017.   (Def.'s CSUMF ¶ 127; Pl.'s Reply CSUMF ¶ 127.)   None of the IEEs recommended substantive changes to or found areas of deficit that were not addressed in R.M.'s or A.W.'s previous IEPs.   (Def.'s CSUMF ¶¶ 66, 119; Pl.'s Reply CSUMF ¶¶ 66, 119.)

## 2.   Post-2018 Evaluation Hearing

After the court-ordered evaluations had been completed, ALJ Beavers held an extensive hearing, during which the sole expert called to testify, Rosemarie Fitzpatrick, opined that R.M.'s Child Study Team at GCHS provided appropriate services to R.M. through continuously monitoring her progress and adjusting the method of delivering services whenever there was a plateau and continuously making cost-benefit analyses to ensure that class time was only lost where the speech therapy was effective.   (Def.'s CSUMF ¶¶ 61, 62; Pl.'s Reply CSUMF ¶¶ 61, 62.)   Fitzpatrick further testified A.W.'s CST provided appropriate speech and language services to her because: there was additional testing when it was indicated; her goals and objectives were adjusted to reflect new information; she made progress with her language and articulation goals; and, the CST was responsive to requests from A.W. and plaintiff, as members of the IEP team. (Def.'s CSUMF ¶ 113; Pl.'s Reply CSUMF ¶ 113.) Fitzpatrick testified that it is very important that the CST took A.W.'s request to eliminate services into consideration:

> [I]n order to be successful in therapy you have to work towards your goals … there's work that needs to be done when you leave the therapy room … I feel like you have to

> respect her.  Right?  So it's her life, her speech.  She
> said … she was very satisfied with the way she sounded
> …. and the therapist felt that … her goals and objectives
> … could be worked on … indirectly in the classroom.   So
> I think it's very important to take students … requests like
> that into account and be respectful.

(CSUMF ¶ 105; Pl.'s Reply CSUMF ¶ 105.)

Similarly, Tamie Hobbs, a school social worker employed by the Gloucester City Board of Education who performed social evaluations, oversaw the educational program of special education students, held eligibility and annual review meetings, and handled anything else classified students required, testified.  (ECF No. 214–4 p. 104.)   Hobbs said that in her opinion, based on criteria provided by the state and looking at A.W.'s cognitive functioning and academic performance, A.W. was capable of participating in her transition planning.   (CSUMF ¶ 106;  Pl.'s Reply CSUMF ¶ 106.)

Before she issued her final decision on plaintiff's due process complaint, ALJ Beavers was appointed a judge of the Superior Court of New Jersey and the matter was reassigned to ALJ David M. Fritch.    (ECF No. 214–1 p. 5 n. 1)  ALJ Fritch reviewed the transcripts and listened to the recorded testimony of the witnesses before issuing a final decision on March 16, 2020.  (Def.'s CSUMF ¶ 22; Pl.'s Reply CSUMF ¶ 22.)

As part of his extensive discussion of the evidence before him, ALJ Fritch noted:

> Fitzpatrick, the sole expert testimony[10] presented in this
> matter, questioned the accuracy of the dysarthria
> diagnosis contained in the girls' IEEs. While this
> diagnosis may provide some insight into why the girls are

---

[10] To the extent plaintiff takes issue with Fitzpatrick being characterized as the only expert to "testify" despite other expert reports having been submitted, plaintiff is misconstruing the ALJ's characterization of live testimony, versus the written report of an expert.   This is of no consequence to the resolution of the Motion, which is based upon the entire record.

making limited progress with speech therapy services, Fitzpatrick's testimony made clear that this diagnosis, even if it was accurate and had been made years earlier, would not have changed the appropriateness of the goals and services provided in the girls' IEPs because the IEPs focus on addressing the deficits that may impact a child's education and not the underlying medical condition which may be the cause of the observed deficits.

(Def.'s CSUMF ¶¶ 61, 111; Pl.'s Reply CSUMF ¶¶ 61, 111.)[11]

A.W.'s independent speech and language evaluation did not indicate that services provided to A.W. were inappropriate or that any deficiencies were not addressed by previous IEPs.   (Def.'s CSUMF ¶ 116; Pl.'s Reply CSUMF ¶ 116.)

ALJ Fritch ultimately concluded:

[T]he District has proved by a fair preponderance of the credible evidence that it provided A.W. and R.M. with a FAPE for the years 2013–17 and did not impede A.W. and R.M.'s rights to a FAPE, impede the girls' parent or guardian's opportunity to participate in the decision-making process regarding the provision of a FAPE, or otherwise deprive them of an educational benefit.

(ECF No. 214–4 p. 150.)

The instant Motion followed.

---

[11] Specifically, Fitzpatrick testified that the testing methods used to diagnose A.W. with dysarthria did not include an oral motor assessment that was based on having the student perform oral movements and looking for symmetry, range of motion, and other indicators that are critical to the diagnosis.   (Def.'s CSUMF ¶ 110; Pl.'s Reply CSUMF ¶ 110.)   Fitzpatrick further opined that A.W.'s needs were met with one 30-minute session per week and concluded that, in her professional opinion, A.W. plateaued in her ability to benefit from speech therapy.   (Def.'s CSUMF ¶¶ 112, 117; Pl.'s Reply CSUMF ¶¶ 112, 117.)   Specifically, she determined that A.W.'s CST provided appropriate speech and language services to her because there was additional testing when it was indicated and her goals and objectives were adjusted to reflect new information, she made progress with her language and articulation goals and the CST was responsive to requests from A.W. and plaintiff as members of the IEP team. (Def.'s CSUMF ¶ 113; Pl.'s Reply CSUMF ¶ 113.)

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

## DISCUSSION

### I.   STANDARD OF REVIEW

Unlike the ordinary method of review for motions brought pursuant to Fed.R.Civ.P. 56,

> The standard of review in an administrative appeal under the IDEA differs from the standard of review governing a typical summary judgment motion. In IDEA cases, district courts are asked to review administrative decisions issued by ALJs; in doing so, district courts exercise modified *de novo* review. Courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. Courts must give due weight and deference to the findings in the administrative proceedings. Accordingly, an ALJ's factual findings are reviewed for clear error. Factual findings are considered prima facie correct, and if a court declines to accept those findings, the court must explain its reasons. An ALJ's conclusions of law, however, are subject to plenary review. The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged. Applying these standards, the district court may make findings based on the preponderance of the evidence.

*S.M. ex rel. B.M. v. Freehold Reg'l Sch. Dist. Bd. of Educ.*, Civil Action No. 22-107, 2024 U.S. Dist. LEXIS 8301, at *17-18 (D.N.J. Jan. 17, 2024) (cleaned up).

To that end, "[a] district court 'should defer to the hearing officer's findings based on credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion.'" *Upper Freehold Reg'l Bd. of Educ. v. T. W.*, 496 F. App'x 238, 242 (3d Cir. 2012) (quoting *Carlisle Area*

*Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)); *see also H.R. v. W. Windsor-Plainsboro Bd. of Educ.*, Civil Action No. 22-3103, 2023 U.S. Dist. LEXIS 128440, at *21 (D.N.J. July 25, 2023) ("As an initial matter, and as Third Circuit precedent dictates, this Court accepts the ALJ's factual findings as prima facie true and will not disturb the ALJ's credibility determinations unless [p]laintiffs introduce non-testimonial extrinsic evidence convincing the Court to do so.").

## II.   ANALYSIS

Plaintiff seeks partial summary judgment on the issue of whether GCPS failed to timely reevaluate A.W. and R.M.   (ECF No. 214–1 p.5.)   In doing so, plaintiff argues ALJ Fritch "committed serious legal error by finding that GCPS met its burden of proof that it provided a FAPE to the Children with disabilities."   (*Id.*)

Pursuant to the IDEA, a child operating under an IEP shall be reevaluated by the Local Education Agency (LEA) "at least once every 3  years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2). However, "[t]he failure to conduct a requested or timely reevaluation is a *procedural violation* of the IDEA … [and] not all procedural violations of the IDEA … constitute a substantive denial of a FAPE."   *A.H. v. Sch. Dist. of Phila*, Civil Action No. 22-4460, 2023 U.S. Dist. LEXIS 154019, at *35-36 (E.D. Pa. Aug. 30, 2023) (cleaned up) (emphasis added).

> Instead, the IDEA provides:
>
> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education *only if* the procedural inadequacies—
>
> > (I)    impeded the child's right to a free appropriate public education;
> >
> > (II)   significantly impeded the parents' opportunity to participate in the decision[-]making process

>    regarding the provision of a free appropriate public
>    education to the parents' child; or
>
> (III)   caused a deprivation of educational benefits.

20 U.S.C. §1415(f)(3)(E)(ii) (emphasis added); *see also H.R.*, 2023 U.S. Dist. LEXIS 128440, at *28 ("A procedural violation of the IDEA, however, 'is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents.'") (quoting *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010)); *Z.B. v. Chambersburg Area Sch. Dist.*, Civil Action No. 1:20-CV-2313, 2023 U.S. Dist. LEXIS 12225, at *54 (M.D. Pa. Jan. 24, 2023) ("Although the Hearing Officer correctly found that the School District violated the procedures set out in the IDEA, the failure to timely reevaluate a student, without more, is simply not substantive harm.").

A plaintiff who alleges denial of a FAPE and substantive harm based upon a failure to timely evaluate has the burden of proving same by a preponderance of the evidence. *H.R.*, 2023 U.S. Dist. LEXIS 128440, at *28 (citing *C.H.*, 606 F.3d at 67); *see also S.M. ex rel. B.M. v. Freehold Reg'l Sch. Dist. Bd. of Educ.*, Civil Action No. 22-107, 2024 U.S. Dist. LEXIS 8301, at *39 (D.N.J. Jan. 17, 2024) ("Plaintiffs have not met their burden of demonstrating that the Board violated the IDEA by failing to reevaluate [in the context alleged].); *A.H.*, 2023 U.S. Dist. LEXIS 154019, at *38 ("Plaintiff fails to show that the District's procedural violation of the IDEA deprived her parents of a meaningful opportunity to participate in the IEP process.   Stated differently, [p]laintiff has not met her burden of showing that she was denied a FAPE."); *Herrion v. District of Columbia*, Civil Action No. 20-3470, 2023 U.S. Dist. LEXIS 51858, at *28 (D.D.C. March 27, 2023) ("The plaintiff bears the burden of establishing that such a procedural defect violated the student's substantive rights.").

In this case, evaluations were initially conducted in April and May of 2014. Three years from the earliest evaluation of April 2, 2014 is April 2, 2017. Three years from latest evaluation of May 12, 2014 is May 12, 2017.   As of May 16, 2017, the Children were no longer residents of Gloucester City and GCPS was no longer responsible for providing an IEP.   Using the latest evaluation date, GCPS was four days beyond the three-year point of the most recent 2014 evaluations but nevertheless, committed a procedural violation of the IDEA.

Inasmuch as plaintiff did have two pending due process complaints against GCPS that did not involve the residency issue, the "stay put" provision of the IDEA was invoked:

> The "stay put" provision of the IDEA, 20 U.S.C. §1415(j), mandates "during the pendency of any proceedings conducted pursuant to this section … the child shall remain in [his or her] then-current educational placement[.]"   A court looks to a child's "existing IEP to determine a child's 'then-current educational placement[.]"

*S.W. v. Elizabeth Bd. of Educ.*, Case No. 2:21-cv-11510 , 2022 U.S. Dist. LEXIS 47495, at *23 (D.N.J. March 17, 2022) (quoting *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136, 140 (3d Cir. 2013)); *see also Lab'y Charter Sch. v. M.R.S.*, Civil Action No. 21-5538, 2023 U.S. Dist. LEXIS 124935, at *14-15 (E.D. Pa. July 20, 2023) ("[T]he IDEA defines the 'then current educational placement' as the IEP functioning when the proceedings commenced.") (quoting *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996)).

Because of the "stay put" provision, the Children in this case were permitted to remain in the Gloucester school system beyond May 16, 2017. While there, they were only entitled to their "then current" educational placement, which is based on the most recent IEP.   Nevertheless, GCPS complied with ALJ Beavers' order to provide for numerous evaluations *after* plaintiff became the children's legal guardian on May 16, 2017 and they were

*residing in a different district*. The evaluations were conducted on the Children and updated IEPs were implemented.

However, in ruling on plaintiff's separate residency appeal on August 28, 2018, ALJ Beavers opined:

> Here, A.W. and R.M. are not entitled to a free education in Gloucester City School District because they live with [plaintiff], their [k]inship [l]egal [g]uardian [KLG]. A student's right to attend school free of charge in a district derives from that student's domicile together with a parent or legal guardian. KLG, as explicitly established by statute, is a permanent status on par in most regards with the rights and obligations of a parent. Therefore, once [plaintiff] attained [KLG] status her residence became A.W. and R.M.'s domicile for the purposes of school attendance.

*K.K.-M., on behalf of minor children, A.W. and R.M. v. Board of Education of The City of Gloucester City, Camden County*, OAL Dkt. No. EDU 02505-18; Agency Dkt. No. 18-1/18, 2018 N.J. AGEN LEXIS 944, at *28 (N.J. OAL Aug. 28, 2018).

On October 4, 2018, the Commissioner of Education (Commissioner) affirmed the above ruling, specifically stating "A.W. and R.M. are not entitled to attend school in the [d]istrict, as their KLG is not domiciled in Gloucester City" and "stay-put" was "inapplicable" to plaintiff's situation. *K.K.-M., on behalf of minor children, A.W. and R.M. v. Board of Education of The City of Gloucester City, Camden County,* OAL Dkt. No. EDU 02505-18; Agency Dkt. No. 18-1/18, pp. 3, 4 (N.J. Comm'r Educ., Oct. 4, 2018). Plaintiff appealed to the New Jersey Superior Court, where the Commissioner's decision was affirmed. *K.K-M. on behalf of minor children A.W. and R.M. v. Bd. of Educ. of City of Gloucester City*, 463 N.J. Super. 24, 229 A.3d 210 (N.J. Super. Ct. App. Div. March 10, 2020).

In yet another matter initiated by plaintiff[12] and decided on June 25, 2019 while the above appeal was pending, ALJ Rabin similarly ruled:

> I FIND that petitioner failed to show that "stay-put" was applicable to the within set of circumstances.   I FIND that petitioner's claims for relief post-dated May 16, 2017, when petitioner became legal guardian of A.W. and R.M., and that as of that date respondent was no longer responsible for providing A.W. and R.M. with FAPE.

*K.K. on behalf of minor child A.W. v. Gloucester City Board of Education*, OAL Dkt. No. EDS 08360-18 OAL Dkt. No. EDS 08361-18 OAL Dkt. No. EDS 09245-18 OAL Dkt. No. EDS 09247-18; Agency Dkt. Nos. 2018-28026, 2018-28027, 2018-28147 and 2018-28146, 2019 N.J. AGEN LEXIS 451, at *9 (N.J. OAL June 7, 2019).

ALJ Rabin's decision was affirmed on appeal in *K.K.-M. v. Gloucester City Bd. of Educ.*, Civil No. 19-15808, 2020 U.S. Dist. LEXIS 153854 (D.N.J. Aug. 25, 2020), where District Judge Robert B. Kugler determined "[b]ecause [p]laintiff is seeking to hold the [d]istrict liable for actions that occurred well after A.W. and R.M. ceased to reside in the [d]istrict … they have no claim for compensatory education."   *Id.* at *11.

Thereafter, in a decision that forms the basis for this motion, ALJ Fritch found the IEPs GCPS had in place between 2013 and 2017 were appropriate and adequately provided the children with a FAPE.   *K.K.-M. on behalf of R.M. v. Gloucester City Board of Education*, OAL Dkt. No. EDS 18461-17, Agency Dkt. No. 2018-27171 (N.J. OAL March 16, 2020) and *K.K.-M. on behalf of A.W.*

---

[12] Plaintiff appealed the Gloucester City Board of Education's finding regarding residency and "claiming that the Board had denied A.W. and R.M. a [FAPE] and failed to produce student records."   *K.K. on behalf of minor child A.W. v. Gloucester City Board of Education*, OAL Dkt. No. EDS 08360-18 OAL Dkt. No. EDS 08361-18 OAL Dkt. No. EDS 09245-18 OAL Dkt. No. EDS 09247-18; Agency Dkt. Nos. 2018-28026, 2018-28027, 2018-28147 and 2018-28146, 2019 N.J. AGEN LEXIS 451, at *1 (N.J. OAL June 7, 2019).

*v. Gloucester City Board of Education*, OAL Dkt. No. EDS 18462-17, Agency Dkt. No. 2018-27170 (N.J. OAL March 16, 2020) (consolidated).

Plaintiff's appeal of ALJ Fritch's decision was initially assigned to Judge Kugler but then later reassigned to me. However, before the reassignment, Judge Kugler ruled that issue preclusion applied to plaintiff's claim that "GCPS violated the IDEA by failing to provide A.W. and R.M. with a FAPE *after May 16, 2017*." *K.K.-M. v. N.J. Dep't of Educ.*, Civil No. 17-11579, 2021 U.S. Dist. LEXIS 149962, at *10 (D.N.J. Aug. 10, 2021) (emphasis added).

It is undisputed that the Children enrolled at GCPS on October 2, 2013. (ECF No. 214–4 pp.21, 23.) They arrived from the Deptford Public School system with a FAPE in place for speech/language-articulation services. (ECF No. 214–4 p.19.) During an identification evaluation plan with GCPS on October 25, 2013, the Children's parents consented to speech assessments. (CSUMF ¶ 82; Pl.'s Reply CSUMF ¶ 82; ECF No. 214–4 p.19.) As of November 14, 2013, GCPS declared the Children eligible for special education or related services under the IDEA category of speech/language–articulation services. (SUMF ¶¶ 9, 10, 11.) A.W. was found eligible based on articulation concerns and a speech IEP was designed that created a program for A.W. to receive speech services three times per month for 30 minutes. (SUMF ¶¶ 6, 7; SUMF ¶ 11; CSUMF ¶ 83; Pl.'s Reply CSUMF ¶ 83.) R.M. was offered an IEP by GCPS on November 14, 2013. (SUMF ¶ 12.) R.M. was also referred to GCPS's Intervention and Referral Services department "due to below grade level reading, writing, and math skills." (SUMF ¶ 58.) As of November 14, 2013, GCPS did not declare A.W. or R.M. eligible for any additional special education or related services. (SUMF ¶ 10.)

On February 19, 2014, GCPS sent a letter inviting the Children's parents to a meeting on March 4, 2014, to determine if any other evaluations were necessary. (ECF No. 214–4 p.21.) Some of the evaluations ultimately

conducted by GCPS on A.W. included but were not limited to: the WISC-IV administered on April 28, 2014; the WIAT-III administered on April 10, 2014; a social assessment performed on April 9, 2014; and the Goldman-Friscoe Test of Articulation that had been given on November 1, 2013.   (ECF No. 214–4 p. 25.)   As of June 2, 2014, GCPS declared A.W. eligible for special education and related services under the Other Health Impaired ("OHI") IDEA category because A.W. had diabetes and an "other medical condition" not specified. (ECF No. 214–4 p. 25.)

Some of the evaluations conducted by GCPS on R.W. included but were not limited to: a psychiatric evaluation on April 2, 2014; a Clinical Evaluation of Language Fundamentals-4 on April 17, 2014; a Test of Language Development-Intermediate (TOLD-1:4) on April 25, 2014 and May 12, 2014; the WISC-IV was administered on April 9, 2014; the WIAT-III was administered on April 14, 2014; a social assessment was performed on April 9, 2014; and the Goldman-Friscoe Test of Articulation was administered on November 1, 2013. (ECF No. 214–4 p. 30.)   As of June 2, 2014, the psychiatric evaluation concluded that R.M. "is somebody who would meet criteria for special education services … certainly many categories may be met (could be Communications Impaired but also even Emotionally Disturbed or Other Health Impaired for anxiety and other comorbidities)."   (ECF No. 214–4 p. 31.)   However, the evaluator further stated: "I would defer to the ultimate decision of others with regards to the programming and how [R.M.] can be best educated and supported."   (*Id*.)   Further, the report of Dr. Hewitt recommended mental health services outside of school, suggested the possibility of starting medications, and addressed attendance issues.   (*Id*.)

Based upon the 2014 evaluations, various assessments performed between 2014 and 2017, the observations of teachers, and input from other interested parties, including plaintiff and the Children (when appropriate), the Children

were never without an IEP during their time in GCPS.   Moreover, the IEPs were adjusted to accommodate the particular needs of each child based on these sources of information.

To the extent plaintiff claims she made several requests for evaluations throughout the years, she provided the ALJ with no evidence of same.   (ECF No. 214–4 p. 147.)   As previously determined within this Circuit,

> Cases interpreting [a] "request" [for evaluation] under the IDEA have generally construed the term narrowly.   In *D.K.*, for example, the Third Circuit explained that "general expressions of concern [do not] constitute a 'parental request for evaluation.'" 696 F.3d at 248 n.5 (interpreting phrase "parental request for evaluation" in 20 U.S.C. § 1415(d)(1)(A)(i)). Likewise, *H.D. by & through Jeffrey D. v. Kennett Consolidated School District*, held that a school district did not deny a child a FAPE by failing to perform "further evaluation in anticipation of possible reenrollment" where the parent's request was not "clearly" made.   2019 U.S. Dist. LEXIS 173481, 2019 WL 4935193, at *24 n.11 (E.D. Pa. Oct. 4, 2019). And, consistent with the Third Circuit, the Eleventh Circuit in *Durbrow v. Cobb County School District* found that a parent's request for "help" or to "test [the child] for something" would not have "amount[ed] to a parental request for an IDEA evaluation." 887 F.3d 1182, 1193 (11th Cir. 2018).

*A. B. v. Abington Sch. Dist.*, 440 F. Supp. 3d 428, 435 (E.D. Pa. 2020).

In light of the evidence of record that establishes GCPS was regularly monitoring the Children's progress throughout the years, regularly holding meetings to assess their progress (of which the children's biological parent(s) and/or plaintiff attended), and regularly adjusting the children's IEPs to meet their needs throughout the relevant time period, I conclude: there was no "loss of educational opportunity" for the Children, and neither the Children's parents nor plaintiff was "seriously deprive[d] … of their participation rights[;]" and, there was no "deprivation of educational benefits."   *Ridley Sch. Dist. v. M.R.*,

680 F.3d 260, 273, 274 (3d Cir. 2012) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010)).   Accordingly, there was no substantive denial of a FAPE for the Children, particularly because they were never without an appropriate IEP between April 2014 and May 16, 2017 and GCPS was not required to provide one after May 16, 2017.   *See H.R.*, 2023 U.S. Dist. LEXIS 128440, at *29–30 (finding "[e]ven if Defendant failed to adhere to procedural rules in waiting [approximately five months] to evaluate S.R. … such violation of the rules was harmless because S.R. … was not deprived of a FAPE by being granted additional FAPE (between June 2020 and November 2020) that otherwise may not have been available to him were he reevaluated and declassified in June 2020.").

    Upon review of the entire record and giving due weight and deference to ALJ Fritch's findings, I discern no clear error in his determination of the facts. Moreover, plaintiff has not met her burden of establishing ALJ Fritch erred with respect to his conclusions of law.[13]   While it is commendable plaintiff

---

[13] I note plaintiff's argument that ALJ Fritch could not assess the demeanor of witnesses by listening to prerecorded testimony from the hearing held before ALJ Beavers.  (ECF No. 214–1 p. 9.)   This argument is unavailing for two reasons.  First, the parties were provided with an "opportunity to re-present any testimony they wished to be heard before [ALJ Fritch], however, both parties responded, in writing, that they did not wish to avail themselves of the opportunity to re-present testimony in this matter . . . and the record was closed upon receipt of confirmation on February 26, 2020." (ECF No. 214-4 pp. 99, 100.)   As such, the issue has been waived.   Second, said issue is without merit.   In *State v. Aquino*, Docket No. A-1539-08T2, 2010 N.J. Super. Unpub. LEXIS 3093 (N.J. Super. App. Div. Dec. 27, 2010), it was held:

> [T]o the extent the trial judge did consider defendant's demeanor, it was relevant to a complete evaluation of defendant's tape-recorded statement.   For example, the court stated:

> Albeit the statement was in Spanish, I had the opportunity to listen to the inflections of the voices, to the nuances that appeared in the tape, and the confession, I find, or the statement that was given, I find, was freely given by the defendant, was not coerced, and is admissible with reference to the elements that were contained in that statement.

seemingly pursued what she believed to be the best educational opportunities for the Children throughout the relevant time period, "[d]istricts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity.'" *Carlisle*, 62 F.3d at 533-534 (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 201 (1982)); *see also Zachary J. v. Colonial Sch. Dist.*, No. 22-1509, 2024 U.S. App. LEXIS 2187, at *11 (3d Cir. Jan. 31, 2024) ("[An] IEP … need not necessarily provide the optimal level of services that parents might desire.") (cleaned up).   In this case, the IEPs provided by GCPS were responsive to plaintiff's input and the needs of the Children; there was no substantive denial of a FAPE.

---

There was consistent, sufficient evidence to warrant the judge's findings of guilt. *Aquino*, 2010 N.J. Super. Unpub. LEXIS 3093, at *27.

### III.  CONCLUSION

GCPS's failure to timely evaluate the Children was not a substantive denial of a FAPE to either Child.   ALJ Fritch's final decision of March 16, 2020 is AFFIRMED and the Motion is DENIED.

An appropriate order follows.


   */s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  May 7, 2024